## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

        Plaintiff,

    v.                                  No. CR 07-748 MCA

**TRAVIS DALLY**,

        Defendant.

### MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant *Travis Dally's Motion to Exclude "Gang Expert" Theodore Griego and Renewed Request for a Pre-Trial Daubert/Kumho Hearing on the Admissibility of the Expert's Opinion* [Doc. 571] filed on March 18, 2009.  The Court held a hearing on the above motion on April 8, 2009.  Having considered the parties' submissions, the evidence and argument presented at the hearing, the relevant law, and being fully advised in the premises, the Court grants the motion in part and denies the motion in part for the reasons set forth below.

## I.   BACKGROUND

The Court's previous *Memorandum Opinion and Order* [Doc. 513, at 7] ruling on the parties' discovery motions relating to expert witnesses directed the Government to provide a specific written proffer regarding the admissibility of any proposed gang-expert testimony that is going to be offered at trial.  [Doc. 513, at 7-8.]   In particular, the Court's prior ruling on this issue directed the Government to do more than merely cite, or attach testimony from, one or more previous cases in which the witness was qualified to testify as an expert.

The Government filed its *Notice of Expert Witness Testimony* [Doc. 540] containing its Rule 16 disclosures for eight expert witnesses on February 19, 2009, followed by a *Notice of Expert Witness Testimony* [Doc. 549] dated February 26, 2009, which contains the written proffer of its gang expert, Special Agent Theodore Griego.  [Doc. 549-2.]  The parties have not engaged in any further motion practice regarding any of the proposed experts listed in the Government's notice, except for the proposed gang expert.

After receiving the Government's written proffers, Defendant Dally filed a motion in limine [Doc. 571] on March 18, 2009, which renewed his earlier motion [Doc. 331] seeking a hearing on the Government's proposed gang expert pursuant to Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993).  The Government filed a response brief [Doc. 596] which reiterated the arguments raised in previous briefing.  [Doc. 549.]  The Court then convened a Daubert hearing on April 8, 2009, at which both parties were given an extensive opportunity to question Agent Griego about all aspects of his proposed expert testimony. [Doc. 607.]  At the hearing, the Court found that Agent Griego is qualified to testify as an expert on the Aryan Brotherhood of New Mexico, and Defendant Dally did not contest that finding.  [Tr. 4-8-09, at 206, 227.]

## II.    ANALYSIS

The Court's finding that Agent Griego is qualified to testify as an expert on the Aryan Brotherhood of New Mexico does not give him *carte blanche* to say whatever he wishes to say to the jury in the form of a lengthy narrative.  Rather, the Court must place appropriate limits on the *scope* of the expert witness's testimony, taking into account the rule prohibiting

an expert from "stating an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto," Fed. R. Evid. 704(b), as well as the relevance and reliability requirements for expert testimony under Fed. R. Evid. 702.  See United States v. Mejia, 545 F.3d 179, 190-93 (2d Cir. 2008).

### 1.      Evaluating the Basis and Methodology for the Gang Expert's Opinions

Rule 702 imposes a special gatekeeping obligation on this Court to ensure that expert testimony is not admitted at trial unless it is both relevant and reliable.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert, 509 U.S. at 592-93.  The relevance of such testimony also must be weighed against "the danger of unfair prejudice, confusion of the issues, or misleading the jury" as well as "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.  While the Court is not required to consider any particular set of factors or utilize a particular procedure in making such determinations with respect to expert testimony, the Court must make *some* kind of determination on the record in order to demonstrate that it has performed its gatekeeping function.  See United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir. 2000); Goebel v. Denver and Rio Grande Western R. Co., 346 F.3d 987, 991-92 (10th Cir. 2003).

Rule 702 was amended in 2000 to state as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of

reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The first requirement of this rule is that the expert's specialized knowledge must "assist the trier of fact."  Id.  "Rule 702 thus dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject."  United States v. Muldrow, 19 F.3d 1332, 1338 (10th Cir. 1994).

The 2000 amendments to Rule 702 also explicitly state that to be admissible in federal court, expert opinions require not only a reliable methodology but also a sufficient factual basis and a reliable application of the methodology to the facts.  See Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 429 (6th Cir. 2007); United States v. Mamah, 332 F.3d 475, 477-78 (7th Cir. 2003).  A "sufficient factual basis" under Fed. R. Evid. 702 does not necessarily require the facts or data upon which an expert bases his or her opinion to be independently admissible, so long as they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. As explained in further detail below, however, the rule permitting expert witnesses to consider inadmissible hearsay in *forming* their opinions does not mean that expert witnesses may simply *transmit* such inadmissible hearsay to the jury--without any further analysis-- under the guise of an expert opinion.  See Mejia, 545 F.3d at 197.

Rather, the Federal Rules of Evidence contemplate that, in order to yield an admissible opinion, expert witnesses must first apply a reliable methodology to the facts or

data they have considered.  Factors to be considered in assessing the reliability of an expert opinion include, but are not limited to:  "(1) whether the opinion has been subjected to testing or is susceptible of such testing; (2) whether the opinion has been subjected to publication and peer review; (3) whether the methodology used has standards controlling its use and known rate of error; (4) whether the theory has been accepted in the scientific community." Truck Ins. Exchange v. MagneTek, Inc., 360 F.3d 1206, 1210 (10th Cir. 2004) (citing Daubert, 509 U.S. at 590).

In the present case, the factual basis and methodology behind Agent Griego's opinions as the Government's proposed gang expert were set forth in summary form in Paragraphs I, II, and III of his written proffer filed on February 26, 2009. [Doc. 549-2, at 1-3.]  The last two questions in Paragraph VIII of Agent Griego's written proffer are also relevant to determining the reliability of his methodology.  There he discusses the need to develop "reliable sources of information" within the Aryan Brotherhood and a "global perspective" on the workings of that organization.  [Doc. 549-2, at 8.]  These topics were the subject of extensive questioning at the hearing on April 8, 2009.  [Tr. 4-8-09, at 194-215.]

After reviewing his written proffer and his testimony at the hearing, the Court finds that the duration and depth of Agent Griego's investigation of the Aryan Brotherhood in New Mexico from 2003 to the present, as well as the extensive volume and variety of sources of information that he accessed and analyzed during the course of his investigation, provide him with a sufficient factual basis to support the formation of expert opinions concerning that organization.  That some of the information he has reviewed consists of hearsay does not

preclude such a finding.  See Fed. R. Evid. 703.

The Court further finds that Agent Griego's investigation of the Aryan Brotherhood employed reliable principles and methods.  In support of this finding, the Court notes Agent Griego's testimony that he would never accept a single piece of information at face value, but instead undertook the task of comparing various items and sources of information against one another in order to seek corroboration.  Agent Griego tested his investigative hypotheses through various methods, such as using undercover agents and cooperating witnesses to surreptitiously record conversations about the subjects of his inquiry, and observing their actions unfold in "real time."  He was able to point to specific instances in which his initial hypothesis about a particular event or statement was proven false through such testing, and such methods of falsification contribute to the reliability of his analysis.  See Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1235 (10th Cir. 2004) ("[A] key factor in valid scientific methodology is the practice of testing hypotheses to determine whether they can be falsified.").

Agent Griego also used an informal method of peer review by discussing his opinions and comparing notes with other law-enforcement agents and cooperating witnesses who have direct experience with the Aryan Brotherhood in New Mexico.  Such informal peer review is one of the techniques that gives Agent Griego the global perspective which distinguishes his specialized knowledge from that of other witnesses whose experience is more limited to specific factual scenarios.

While it is true that Agent Griego's methodology does not employ the more clearly

defined and generally accepted standards typical of scientific evidence, I find that Rule 702 does not require such scientific standards in the context presented here.  As discussed in further detail  below, there is a fine line to be drawn between a law enforcement officer's testimony as an expert and his or her testimony as a fact witness.  See, e.g., United States v. Caballero, 277 F.3d 1235, 1247 (10th Cir. 2002).  To the extent that Agent Griego's testimony crosses the line into the realm of an expert witness, the methodology and specialized knowledge behind his opinions is largely based on a relatively simple pattern of inductive reasoning that does not exhibit the types of logical gaps or unreliable complexities which would run afoul of Daubert and its progeny.

### 2.    Defining the Proper Scope of the Gang Expert's Opinions

The determination that Agent Griego is qualified as an expert and has both a sufficient factual basis and a reliable methodology does not end the Court's inquiry, because the Court also must determine whether or to what extent he reliably applied that methodology to the facts at issue in the present case, and whether or to what extent the resulting opinions will assist the trier of fact.  With respect to making the latter determinations in the specific context of a gang expert, the Second Circuit's opinion in Mejia is particularly helpful because it recounts the history of the emerging practice of using law enforcement officers as expert witnesses in organized-crime cases.  Such "gang experts" first were employed to explain the meaning of certain specialized terminology or "jargon" used by members of criminal organizations during recorded conversations that were admitted as co-conspirator statements or admissions by a party opponent and played for the jury at trial.  See Mejia, 545

F.3d at 189.  This practice of using gang experts to explain the use of specialized terminology then expanded to cover other topics, such as describing requirements for membership in a specific criminal organization and the organization's internal operating rules, which help to define a RICO "enterprise."  See id. at 189-90 (citing United States v. Locascio, 6 F.3d 924, 936 (2d Cir. 1993), and United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988)).  The admission of such testimony was based on the common-sense rationale that an untrained layperson would not be able to understand the underlying factual evidence in the case (such as a recorded conversation or coded message) without the definitions of certain terminology and organizational structure provided by the gang expert.  See id.

While Mejia and the Second Circuit opinions cited above appear to be the leading authorities on the use of law enforcement officers as expert witnesses in organized-crime prosecutions, they are consistent with the law in the Tenth Circuit and the law that this Court has cited in past opinions.  For example, the Tenth Circuit has also interpreted Rule 702 of the Federal Rules of Evidence as requiring "a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject."  Muldrow, 19 F.3d at 1338.  Under this approach, expert opinions with the proper foundation may be necessary and helpful to explain how an item of physical evidence introduced through a fact witness is used to carry out a particular criminal activity or further the goals of a RICO enterprise.  See e.g., United States v. Robinson, 978 F.2d 1554, 1563-64 (10th Cir. 1992) (affirming the admission of expert testimony on "gang affiliation" where that testimony consisted of explaining the significance of various items of physical evidence

seized during the execution of a search warrant, such as the association of blue clothing with the "Crips" gang); United States v. Silverstein, 737 F.2d 864, 866 (10th Cir. 1984) (noting in dicta the government's introduction of evidence that a defendant used certain symbols and phrases characteristic of the Aryan Brotherhood in his correspondence and that the defendant's tattoo was a symbol of that group).  The authorities cited above support a finding that much of the testimony proposed in Paragraphs IV, V, VI, and VII of Agent Griego's written proffer [Doc. 549-2, at 3-7] and described during his direct examination at the hearing on April 8, 2009, is based on a reliable application of his methodology and will assist the trier of fact to understand the evidence and determine the facts relevant to the essential elements of the offenses charged in the *Superseding Indictment*.

Based on his written proffer and his extensive testimony at the Daubert hearing, the Court therefore concludes that Agent Griego satisfies the requirements of Rule 702 with respect to testifying about his specialized knowledge of:  (1) the basic structure of the Aryan Brotherhood in New Mexico and Texas [Tr. 4-8-09, at 64-65, 147-48, 174-75], including changes in leadership and divisions or "splits" within the organization [id. at 87, 105, 178-82]; (2) membership requirements, including recruitment procedures, eligibility criteria, ongoing obligations, and disciplinary measures [id. at 91-92, 175-76]; and (3) the jargon, codes, or other specialized modes of communication that are commonly used among Aryan Brotherhood members [id. at 65-71, 93-96, 109, 182-84], including the "constitution" and "blind faith commitment." [Id. at 79-86, 109.]  Accordingly, Agent Griego will be permitted to provide "brief, crisp answers to the Government's questions" about these "discrete topics"

which are "beyond the ken of the average juror."  United States v. Tapia-Ortiz, 23 F.3d 738,

740-41 (2d Cir. 1994).

During his cross-examination of Agent Griego at the hearing on April 8, 2009,

Defendant Dally's counsel pointed to several instances in which the agent was not able to tie

his expert opinions concerning the general topics described above to specific evidence

implicating Defendant Dally.  For example, Agent Griego did not present a "blind faith

commitment" signed by Defendant Dally or show that Defendant Dally possessed a copy of

the Aryan Brotherhood "constitution."  [Tr. 4-8-09, at 122.]  Such a specific link to

Defendant Dally is not necessary to demonstrate the relevance of Agent Griego's expert

opinions on these more general topics, because the offenses with which Defendant Dally is

charged in this case include several elements that concern the racketeering activities of the

enterprise as a whole, not just his personal conduct.

Defendant Dally further asserts that Agent Griego's testimony is not necessary

because Defendant Dally has proposed to stipulate or admit the Aryan Brotherhood's status

as a RICO enterprise and his membership in that enterprise.  As explained in the Court's

prior ruling on the Government's Rule 404(b) evidence, however, such stipulations do not

necessarily preclude the Government from presenting evidence on these elements and are but

one factor to consider in applying the Rule 403 balancing test.  [Doc. 651.]  In this instance,

the Court finds that Agent Griego's  expert testimony on the general topics described above

will assist the jury by going beyond the "bare bones" of the proposed stipulations and

providing important background information and context for the anticipated testimony of the

fact witnesses.  The danger of unfair prejudice and other concerns set forth in Rule 403 do not outweigh the probative value of the agent's testimony on these topics.

### 3.	Precluding the Gang Expert from Testifying About Mental States

The admission of expert testimony on the general topics described in the preceding section does not imply that Agent Griego may use these topics as a springboard to opine about the intent, knowledge, or other mental state of the author or recipient of a particular communication.  Agent Griego is not a psychologist, and Rule 704(b) specifically precludes an expert witness from  stating "an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto."  Fed. R. Evid. 704(b); see United States v. Richard, 969 F.2d 849, 852 (10th Cir. 1992).  Thus, Agent Griego will not be permitted to testify that a specific communication meant that a defendant had the intent, knowledge, or other mental state required to commit one or more of the crimes charged in the *Superseding Indictment.*  [Doc. 36.]

More generally, a gang expert strays from the scope of an admissible opinion under Rule 702 when he claims to know the exact, true meaning of particular conversations, *instead* of just supplying definitions for certain coded language as necessary to help the jury understand and draw its own inferences about those conversations.  See Mejia, 545 F.3d at 192 (citing United States v. Dukagjini, 326 F.3d 45, 55 (2d Cir. 2003)); United States v. Matera, 489 F.3d 115, 121 (2d Cir. 2007) (finding no abuse of discretion where the district court limited a gang expert's testimony to general information about the composition and

structure of organized crime families rather than specific information about the membership or rank of the defendants).  Thus, to keep his expert testimony in accordance with the principles articulated in Mejia, Agent Griego will be confined to explaining the coded language or communication techniques in a general manner which leaves jurors with the task of applying what they have learned from his expert testimony to the context of a specific communication that is introduced at trial through a fact witness.  See Richard, 969 F.2d at 852-53 (noting that it should be left to the jury to draw the inferences about a defendant's mental state instead of having the expert witness state those inferences in his or her opinion); Muldrow, 19 F.3d at 1338 (similar).  Counsel may, of course, assist the jury in this task by putting Agent Griego's expert testimony together with the factual evidence to make the desired inferences during closing arguments, but the Court will not allow the Government's case agent to provide such closing arguments himself under the guise of expert testimony.

The agent's testimony at the hearing on April 8, 2009, contains several instances in which he phrased his opinions in terms of an author's or speaker's intentions, or claimed to know how the parties to a particular communication would have understood it.  For example, instead of just defining the commonly accepted meaning of a particular term or figure of speech as it appears in a document such as Government's Exhibit 5, Agent Griego phrased his testimony in terms of what the writer and reader are thinking, doing, or trying to accomplish.  [Tr. 4-8-09, at 99-106.]  By phrasing his testimony in this manner, Agent Griego represents himself as an expert on the intentions of the persons named in the document, rather than just an expert on the terminology and communication techniques used

in the document itself.  This he will not be permitted to do.

In order to limit the agent's expert testimony to the terminology and communication techniques noted above, as required under Rules 702 and 704(b), the Court will require the Government to phrase its questions more carefully at trial so as to speak in terms of the agent's own expert opinion about the *commonly accepted* meaning of particular language used in Aryan Brotherhood communications, rather than directly attributing that meaning or understanding to the mind of a specific Aryan Brotherhood member or associate.  Such limitations are, of course, directed to the agent's expert testimony during the Government's case-in-chief and do not necessarily preclude him from testifying about  matters that are invited during cross-examination by Defendant Dally's counsel.  To the extent that such cross-examination is directed at dissociating Defendant Dally from the Aryan Brotherhood, it tends to undermine his proposed stipulations and may open the door to rebuttal evidence by the Government.  <u>See</u> <u>Tapia-Ortiz</u>, 23 F.3d at 741 (noting that the scope of expert testimony may be expanded when the defense seeks to discredit the government expert's opinions as improbable or not suggestive of criminal activity).

**4.      Distinguishing Gang-Expert Testimony from Factual Testimony: The Dual Roles of Agent Griego as a Witness and the Limits Placed Thereon**

Portions of Agent Griego's written proffer and his testimony at the hearing on April 8, 2009, concern topics that go beyond the three general areas that are delineated in the preceding sections of this *Memorandum Opinion and Order*.  For example, Paragraph VIII of Agent Griego's written proffer summarizes the activities of the Aryan Brotherhood as

follows:  (1)  "The AB as an organization supports itself through drug trafficking, mostly the manufacture and distribution of methamphetamine, identity theft, assault, kidnapping, murder, conspiracy to commit murder, as well as an organized campaign of check fraud, identity theft, and other petty thefts" both inside and outside of prison [Doc. 549-2, at 7]; and (2) the AB affects interstate commerce or moves across state lines through "[t]elephone and computer-based communications across state lines between Texas and New Mexico, and actual travel between Texas and New Mexico" and other states such as "Oklahoma, maybe Kansas, and possibly Arizona.  The drug and firearm trades in which the AB engages cross state lines as well, affecting communities on both sides."  [Doc. 549-2, at 8].  At the hearing on April 8, 2009, the Government reiterated its intent to ask Agent Griego to speak broadly on the topic of "Activities of the AB in New Mexico."  [Tr. 4-8-09, at 185.]  In addition, Agent Griego made other sweeping conclusions, such as "we were able to prevent nine murders" [Tr. 4-8-09, at 73], there were three conspiracies to murder a sheriff's deputy [id. at 78], and "Mr. Hamilton was the leader of the third Aryan Brotherhood conspiracy to kill Deputy Anders."  [Id. at 150, 162.]

The Court determines that such broad and sweeping opinions about *entire crimes* planned or committed by those associated with the Aryan Brotherhood do not meet the requirements for the admission of expert testimony under Rule 702.  In proffering the agent's opinions on these topics, the Government has failed to carefully distinguish the line that "separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible

substitution of expert opinion for factual evidence." Mejia, 545 F.3d at 190.

To distinguish himself as an expert witness--as opposed to merely a fact witness who transmits or describes to the jury his personal observations of a particular event or item--the agent must sufficiently articulate the intermediate steps through which he has applied a particular *methodology* based on *specialized knowledge* to the facts of the case before him. Without such information, the Court cannot discern the *reliability* of Agent Griego's opinions or, for that matter, whether he is merely transmitting factual evidence in the form of an expert opinion without really applying *any* methodology or specialized knowledge at all. "When the Government skips the intermediate steps and proceeds directly from internal expertise to trial, and when those officer experts come to court and simply disgorge their factual knowledge to the jury, the experts are no longer aiding the jury in its factfinding; they are instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense." Mejia, 545 F.3d at 190. In the words of the Tenth Circuit, this type of expert testimony "unduly invade[s] the province of the jury when assistance of the witness is unnecessary" and "'merely tell[s] the jury what result to reach.'" Sims v. Great Am. Life Ins. Co., 469 F.3d 870, 889 (10th Cir. 2006) (quoting Fed. R. Evid. 704 advisory committee notes).

Such a substitution of expert opinion for factual evidence is "illegitimate and impermissible" for a number of reasons. Mejia, 545 F.3d at 190. First, by instructing the jury that one or more elements of the charged offenses have been satisfied, the expert is contravening the Tenth Circuit's holding that expert witnesses may not usurp the jury's

factfinding role in determining which version of events is more credible, see United States v. Adams, 271 F.3d 1236, 1245-46 (10th Cir. 2001), and may not usurp the Court's role in instructing the jury on the applicable law, see Specht v. Jensen, 853 F.2d 805, 807-09 (10th Cir. 1988). As mentioned above, counsel are free to present closing arguments to persuade the jury that one version of events is more credible than another and to draw inferences about whether the Government has satisfied its burden of proof as to each element of the offense, but the Court will not allow the Government's case agent to provide such closing arguments under the guise of expert testimony which vouches for the credibility of the Government's fact witnesses.

As the Court has stated in past rulings, such impermissible vouching occurs when expert witness testimony "take[s] the form of a lengthy narrative statement of a typical [narcotics] trafficking enterprise followed by an opinion that Defendant's activities in this case fit the pattern or profile of such an enterprise." United States v. Michael, No. 06cr1833 MCA, Doc. 119 (D.N.M. unpublished memorandum opinion and order filed Nov. 15, 2007, citing Tapia-Ortiz, 23 F.3d at 740-41). Such narrative statements present additional problems insofar as they summarize out-of-court testimonial statements and other hearsay attributed to cooperating witnesses, confidential informants, and other sources without applying any discernible form of analysis that would amount to a reliable and relevant methodology under Daubert. See Mejia, 545 F.3d at 190-91.

Simply transmitting hearsay statements concerning the results of a police investigation in the form of a narrative summary does not fall within the parameters of an expert opinion

under the Federal Rules of Evidence.  The jury does not need an expert's assistance to understand the mere transmittal of the statements themselves, and the jury is entirely capable of drawing its own reasonable inferences about whether a crime has been committed, see id. at 194-96, because that "is the very type of fact determination a jury is equipped to make," Sims, 469 F.3d at 889.  Using gang experts to circumvent the hearsay rules in this manner also may run afoul of our Supreme Court's recent interpretation of the Confrontation Clause in Crawford and its progeny, insofar as the sources of information on which the gang expert relies in stating his opinions are testimonial and are not available for cross-examination at trial.  See Mejia, 545 F.3d at 198-99.

        In this regard, the broad opinions concerning the activities of the Aryan Brotherhood which are set forth in Paragraph VIII of Agent Griego's written proffer [Doc. 549-2, at 7-8] are remarkably similar to those which the Second Circuit found inadmissible in Mejia.  For example, the Mejia opinion cited as inadmissible  "[the agent's] testimony that the FBI gang task force had seized '[p]robably between 15 and 25' firearms, as well as ammunition, from MS-13 members; his statement that MS-13 members on Long Island had been arrested for dealing narcotics; and his statement that MS-13 had committed 'between 18 and 22, 23' murders on Long Island between June 2000 and the trial." Id. at 194-95.  Such inadmissible testimony parallels Agent Griego's sweeping conclusions that his investigation was "able to prevent nine murders" [Tr. 4-8-09, at 73] and revealed that the Aryan Brotherhood supported itself through the commission of the various crimes enumerated in his written proffer.  [Doc. 549-2, at 7.]

In <u>Mejia</u>, there also was inadmissible testimony "about the ways that MS-13 members traveled when fleeing from prosecution or when transporting contraband, [the agent's] assertion that MS-13 members from Virginia, California, and El Salvador had attended organizational meetings in New York State, . . . his statement that MS-13 leaders communicated by telephone . . . [,] his testimony about the use of MS-13 treasury funds to buy firearms and narcotics, his statement that the gang occasionally dealt narcotics, and his statement that MS-13 taxed non-member drug dealers." <u>Id.</u> at 195. Again, such inadmissible testimony parallels Agent Griego's broad assertions about Aryan Brotherhood activities that crossed state lines or otherwise affected interstate commerce. [Doc. 549-2, at 8.]

In issuing these rulings, the Court does not wish to diminish Agent Griego's qualifications or accomplishments as an investigator. However, with great emphasis it must be noted that Defendant Dally's trial is not the proper forum for touting those qualifications and accomplishments through an extensive narrative account of all the criminal activity that the agent uncovered or prevented during the entire course of his investigation. Presenting such a broad narrative summary goes "far beyond interpreting jargon or coded messages, describing membership rules, or explaining organizational hierarchy" and instead takes on the greater role of "essentially summariz[ing] the results of the Task Force investigation" and addressing "matters that the average juror could have understood" without the aid of an expert. <u>Id.</u> at 195 (citations omitted).

Unlike topics such as the Aryan Brotherhood's organizational structure and its use of coded language or specialized terminology, the "activities" or specific crimes committed by

members of that organization can be understood by a jury through fact witnesses with first-hand knowledge, without the need for an expert opinion on the ultimate issue of whether a crime was committed.   In this case, the Government has not provided a satisfactory explanation of why its case agent, presented as a gang expert, needs to give the jury such a summary opinion as to whether the Aryan Brotherhood bears responsibility for an *entire crime* (*e.g.*, drug trafficking or identity theft), instead of following the usual trial procedure in which the Court receives evidence concerning the elements of a crime from fact witnesses with the requisite personal knowledge whose testimony is taken under oath and subject to cross-examination in accordance with the rules governing hearsay.

As noted in the Court's prior rulings [Doc. 651], Defendant Dally is not contesting the membership and enterprise elements of the violent crimes in aid of racketeering with which he is charged in this case.  In addition, the Court has conditionally admitted a number of non-testimonial statements pursuant to the Government's motion in limine [Doc. 628] and denied Defendant Dally's motion to suppress his recorded statements to a cooperating witness on April 16, 2007, which contain numerous admissions concerning his membership in the AB, knowledge of the AB's racketeering activities, and intent to maintain or increase his position in the AB.  [Doc. 601.]  Cooperating witnesses also may testify about their own personal participation in crimes which amount to "racketeering activity" or have the requisite interstate nexus under the violent crimes in aid of racketeering statute.  In addition, there are law enforcement officers with personal knowledge of physical evidence of such activity that was recovered pursuant to the search warrants for the Rio Rancho apartments occupied by

Henry George in June 2002, the searches of Defendant Raymond and his vehicle in June 2002, and subsequent investigative efforts.

Indeed, such law-enforcement fact witnesses may include Agent Griego himself, because the limitations imposed herein with respect to Agent Griego's testimony as an *expert* do not necessarily preclude him from also testifying within the usual parameters of a *fact witness* based on his personal knowledge of particular activities that he observed during the course of his investigation.  See Caballero, 277 F.3d at 1247 (noting "it is possible for the same witness to provide both lay and expert testimony in a single case").  Agent Griego's factual testimony may touch upon one or more elements of the charged offenses, so long as he does not attempt to circumvent the limitations on his expert testimony by simply reiterating, under the guise of factual testimony, the summary opinions which are excluded under the Daubert analysis set forth above.

To properly distinguish between the agent's role as an expert and his role as a fact witness, the Government has represented that it will call him to testify on two separate occasions during its case-in-chief.  [Tr. 4-8-09, at 171.]  One of those occasions will be limited to expert testimony and the other will be limited to factual testimony.  In addition, the Court will offer a limiting instruction, with input from the parties [Doc. 631], to identify for the jury when Agent Griego is testifying as an expert and to highlight the differences between his role as an expert and his role as a fact witness.  See Matera, 489 F.3d at 121 (finding no abuse of discretion where gang-expert testimony was coupled with such a limiting instruction).

Finally, to the extent that counsel have any concerns about whether they are about to cross the line or open the door to inadmissible testimony from Agent Griego, they are instructed to approach the bench and seek a ruling outside the presence of the jury to further clarify the permissible boundaries of such testimony.  As the Court cannot anticipate every question or response that might occur during the trial, the Court's pretrial rulings are subject to reconsideration if unforeseen circumstances arise or further clarification is needed at trial.

## III.    <u>CONCLUSION</u>

Subject to the conditions and limitations set forth above, the Court determines that Agent Griego is qualified to testify as a gang expert by providing brief, crisp answers to counsels' questions about his specialized knowledge of:  (1) the basic structure of the Aryan Brotherhood in New Mexico and Texas, including changes in leadership and divisions or "splits" within the organization; (2) membership requirements, including recruitment procedures, eligibility criteria, ongoing obligations, and disciplinary measures; and (3) the jargon, codes, or other specialized modes of communication that are commonly used among Aryan Brotherhood members, including the "constitution" and "blind faith commitment." Defendant Dally's <u>Daubert</u> motion is denied in part insofar as it seeks to preclude Agent Griego from presenting expert testimony in these discrete areas.  Defendant Dally's motion is granted in part insofar as it seeks to preclude Agent Griego from presenting expert testimony that attributes a particular mental state to one or more participants in a specific communication or offers summary opinions of the type exemplified in his answers to the first three questions in Paragraph VIII of his written proffer.  [Doc. 549-2, at 7-8.]

**IT IS THEREFORE ORDERED** that Defendant *Travis Dally's Motion to Exclude "Gang Expert" Theodore Griego and Renewed Request for a Pre-Trial Daubert/Kumho Hearing on the Admissibility of the Expert's Opinion* [Doc. 571] is **GRANTED IN PART** and **DENIED IN PART** under the conditions specified above.

**SO ORDERED** in Albuquerque, New Mexico, this 12th day of May, 2009.

_____

**M. CHRISTINA ARMIJO**
United States District Judge